IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                          Case No. 22-10006-JWB

TOMMY L. ANDERSON, SR.,

        Defendant.

## MEMORANDUM AND ORDER

This matter is before the court on Defendant's motion to suppress evidence.  (Doc. 24.) The government has filed a response.  (Doc. 28.)  The court held two evidentiary hearings on the motion: the first on January 24, 2023, and the second on January 30.  The court took the matter under advisement at the conclusion of the hearings and is now prepared to rule.  For the reasons stated herein, Defendant's motion is DENIED.

### I.  Facts

Defendant's motion to suppress challenges the lawfulness of six related searches by Wichita Police Department (WPD) officers.  The first of these was a warrantless search of a Cadillac DeVille after Defendant fled from police and left the car parked on a residential street. The second and third searches involved Defendant's residence on Millwood Street in Wichita and were conducted pursuant to search warrants.  The fourth search involved a warrantless search of a Chrysler 200 shortly after Defendant drove the car to a repair shop and was arrested.  The last two searches involved residences on S. Holyoke Street in Wichita used by Defendant and were conducted pursuant to search warrants.

1. **April 8, 2021, Search of Cadillac DeVille**.

On April 8, 2021, WPD Officer Jeremy Gray was conducting a drug investigation focused on Defendant.  Gray was part of the WPD's Special Investigation Bureau/Community Response Team (SBI/CRT), whose responsibilities included investigating street level drug crimes.  Gray had been informed by an anonymous source that Defendant was selling drugs from his residence and from the trunk of his Cadillac.  Gray had engaged in periodic surveillance of what he believed to be Defendant's residence at 1116 S. Millwood, Unit No. 4, in Wichita.  For some period prior to April 8, 2021, Gray had also checked on activity at the residence by means of a "pole cam" – a camera installed on a utility pole outside the residence.  Gray could monitor the pole cam from his cell phone and was doing so on the afternoon of April 8 with WPD Officer Clayton Van Daley in a marked patrol car a short distance from the Millwood residence.

Gray was aware on April 8 that Defendant's driver's license had been suspended.  He also knew Defendant had previously been charged with narcotics offenses, had been convicted of felonies in a federal RICO case, and was believed by police to be a Crips gang member.  Gray was familiar with Defendant and knew what he looked like.  Gray was also familiar with two vehicles frequently seen at the residence: a silver Cadillac DeVille, which was registered to Defendant's brother and which Gray had seen Defendant frequently driving, and a black Chrysler 200 registered to Mary Dean, who was Defendant's girlfriend and who also lived at the Millwood residence.  During his period of surveillance, Gray saw other vehicles frequently come to the Millwood residence, after which the occupants would enter the residence for a brief period and then leave, in a manner Gray considered to be consistent with drug trafficking.

At about 1:00 p.m. on April 8, Gray was monitoring the pole cam from his phone when he saw Defendant leave the Millwood residence wearing a black shirt, dark jeans, and black athletic

shoes with an "N" on the side. Gray could see that Defendant got in the Cadillac and drove away to the north. Gray and Van Daley started out in their patrol car intending to intercept Defendant, with the intention of making a traffic stop based on Defendant's suspended driver's license and, if possible, obtaining evidence of drug distribution. The officers located the Cadillac within a short time and followed it on Kellogg Avenue until the Cadillac started to exit on Hillside Street. The incident was recorded on video by Gray and Van Daley's "body cams." Gray turned on the patrol car's emergency lights in an attempt to stop the Cadillac. Defendant briefly continued on Hillside Street before turning right at the first side-street (Lewis) and pulling over to the curb as the officers pulled in behind him. Gray and Van Daley got out of their vehicle. Gray testified he could see Defendant looking at him in the Cadillac's side view mirror and that Defendant appeared to be reaching or moving downward. As the officers started to approach the Cadillac, it suddenly accelerated away from the curb and took off.

The officers got back in their vehicle, turned on the siren, and pursued. As they did so, they saw Defendant commit more than five moving violations, with the violations called out on the radio by Van Daley as they occurred. At that point the officers had probable cause to believe Defendant committed the felony offense of fleeing and eluding under K.S.A. § 8-1568(b)(1)(E). Defendant's violations included failing to stop at numerous stop signs and failing to signal turns. The officers were called off the pursuit by a supervisor due to the high speeds and/or danger involved, and they lost sight of the Cadillac. Gray and Van Daley continued driving through the neighborhood where they had last seen the vehicle. A pedestrian indicated the direction the car had gone, and the officers turned and drove that way, but the car was not in sight. After a minute or two, Gray said he was turning off his body cam video, thinking the pursuit was over, and continued driving. Just as he turned the camera off, the Cadillac came into the officers' view

parked by the curb on a side street.  Van Daley's body cam at that point shows Van Daley getting out of the patrol car and approaching the Cadillac.  He identified it as the car they had pursued.  He pulled out his handgun, which had a flashlight attachment.  The Cadillac windows were tinted, making it somewhat difficult to see inside. The passenger side rear window was down about an inch or two.  Van Daley shined his light through the gap in the window and confirmed that no one was inside the car.  He did not insert the light into the window opening.  A nearby witness indicated that the driver, whose description matched Defendant's, had run off.

The officers radioed for a K9 unit to conduct a dog sniff of the vehicle exterior.  WPD Officer Daniel Gumm and his K9 "Bane" arrived at the scene within fifteen or twenty minutes. Bane was trained and certified in detection of various drugs, including marijuana.  Gumm gave Bane a "find it" command and the dog immediately began circling the car and sniffing, beginning near the front of the car on the driver's side.  Bane raised up once or twice without touching the car, and then momentarily touched his paws on the driver's door as he raised up again.  He lowered himself and moved backwards towards the rear driver's side door.  Bane quickly became focused on the rear door, sniffed at the door handle, and then sat down next to it, staring intently at it and wagging his tail.  The evidence showed this was the dog's method of indicating it had located the source of a controlled substance.  Gumm opened the rear driver's side door to allow Bane in the interior of the car.  The dog again indicated near the front center console of the car between the front seats. When Gumm attempted to open the driver's door, he found it was locked.  He reached through the open rear driver's side door and lifted the "plunger" lock on the driver's door.  When he opened the driver's door, the car's alarm went off.  A search of the car's interior disclosed a marijuana roach in the center console, a marijuana bud, and an empty digital scale box.  A set of keys was also found but they were not the keys to the vehicle.  Later that day, after his shift was

over, Gray was monitoring the pole cam on his phone and saw that Defendant returned to the Millwood residence and was still wearing the same clothes he had been wearing earlier.

### 2. **April 15, 2021 Searches of Millwood Residence**.

After the April 8 incident, Gray wanted to get a search warrant for Defendant's Millwood residence. The WPD's standard practice called for Gray to explain the facts to his supervisor, Sgt. Thode, who would review the matter for probable cause and discuss it with the District Attorney's ("DA") office. Gray talked to Thode about getting a search warrant for the Millwood residence based on the items found in the Cadillac. Thode contacted an attorney in the DA's office. The attorney conveyed to Thode that obtaining a search warrant for the articles of clothing that Defendant was seen wearing at the time of the car chase was an option. As a result, Gray prepared an application for a search warrant to look for the following items in the Millwood residence:

1. Black long sleeve shirt
2. Dark blue jeans
3. 2 Black athletic shoes with the letter "N" portrayed on the side
4. Keys to a silver Cadillac Deville bearing Kansas tag 135MVK
5. Photographs and measurements
6. Indicia of occupancy or ownership

(Govt. Exh. 8) The application described the residence, detailed the anonymous complaint about Defendant's distribution of drugs from the residence and car, and set forth Defendant's criminal history (including convictions for possession of marijuana, carrying an unconcealed weapon, conspiracy, and two counts of distribution of cocaine base). It also described Gray's investigation and surveillance, including his findings that the Cadillac was registered to Alford Anderson (at another address) and the Chrysler was registered to Mary Dean at the Millwood address. Dean's criminal history was alleged to include unlawful possession of marijuana and sale of opiates. It described the circumstances and pursuit of Defendant on April 8 and alleged that Gray and Van Daley saw more than 10 traffic violations by Defendant as they pursued him which gave "rise to a

felony crime." (*Id.* at ANDERSON_000096.)  It described the dog sniff and the search and the discovery of drug items in the car.  It asserted that Gray saw Defendant return to the residence at about 6:13 p.m. driving the Chrysler, and that Defendant got out of the car wearing the same black shirt, dark jeans, and black athletic shoes with "N" on the side that he was wearing earlier in the day.

At the suppression hearing, Gray testified the purpose of the "photographs and measurements" authorization in the application was to allow officers to take photographs of evidence and, if necessary, to take measurements related to evidentiary items.  He testified that "indicia of occupancy or ownership" would include bills and correspondence addressed to Defendant at the Millwood residence as well as documents showing ownership or use of the Cadillac.

On April 14, 2021, Gray completed a warrant application that was submitted to a district judge of the Eighteenth Judicial District Court in Wichita, Kansas.  The judge issued a warrant the same day authorizing a search of the Millwood residence for the specified items.  (Govt. Exh. 8.) The warrant refers to the application and includes some language about incorporation of items from it. (*Id.* at ANDERSON_000099.)[1]  The warrant was issued electronically and sent by electronic means to Gray.

Gray met with his unit of about ten officers the next morning, April 15, and reviewed the events of the chase from April 8, Defendant's history, and the search warrant.  At some point, Sgt. Thode informed the officers of the items they were looking for and said they could search any place in the house where a reasonable person would believe the articles sought would be located.

---

[1] The warrant lists the items constituting evidence of an offense and states that they "are located in or upon the above described … places …, including the items described in the accompanying application for search warrant which are incorporated herein by reference."  (Govt. Exh. 8 at ANDERSON_000099.)

The officers went to the Millwood residence at about 10:00 a.m. to execute the warrant. The only persons in the residence were Lakashia Anderson and two young children. Upon entering the living room, officers saw marijuana in a clear plastic bag in plain view. They found an energy bill addressed to Defendant at the Millwood address. In the only bedroom of the house, officers saw in plain view a firearm magazine with some .22 cartridges in it, two boxes of ammunition (.45 and .40 caliber), a plastic baggie with about 2 grams of marijuana on a folding table, an identification card in Defendant's name on the same table, and a plastic baggie with 1 gram of marijuana on a T.V. tray. At that point, which was about twenty minutes after they arrived, the officers ceased searching and Gray left to prepare a supplemental application for search warrant. The supplemental application included a description of the items found during execution of the initial warrant and sought an amended warrant to search for additional items, including firearms and ammunition, marijuana, packaging material and other drug paraphernalia used in the sale of marijuana, and cash used in the sale of marijuana. Based on input from an attorney in the DA's office, Gray's supplemental application also elaborated on the "indicia of occupancy" sought. (Govt. Exh. 9.) Based on the supplemental application, a Sedgwick County district judge issued an amended search warrant at 12:14 p.m. Like the earlier warrant, the second warrant contained the same incorporation language concerning items in the warrant application. Gray returned to the Millwood residence, where Sgt. Thode explained to the officers what they were now authorized to search for by the amended warrant. Gray completed two returns listing the items found and seized by the officers during the searches, including "firearm, ammunition, illegal drugs, paraphernalia, U.S. currency, cell phone, indicia, clothing, keys." (*See* Govt. Exh. 8 at ANDERSON_000100) (punctuation marks added).

### 3. **August 3, 2021 Search of Chrysler**.

On July 30, 2021, Gray prepared an application for a search warrant on 2442 S. Holyoke in Wichita, to search for items including marijuana, cocaine, paraphernalia used in the sale of drugs, U.S. currency, drug ledgers or similar items, indicia of occupancy of the residence, and firearms and ammunition.  (Govt. Exh. 10.)  The application set forth various facts connecting Defendant to this residence and indicating Defendant was engaging in drug distribution from the residence.  A Sedgwick County district court judge issued a warrant on July 30, 2021, authorizing police to search 2442 S. Holyoke for the specified items.

On August 3, 2021, officers were near the Holyoke residence preparing to execute the above warrant when they saw Defendant and Mary Dean drive away from the residence in Dean's Chrysler.  Officers followed the Chrysler to an auto repair shop, where they proceeded to arrest Defendant on an outstanding bench warrant just as he walked in to the repair shop.  The Chrysler was backed into a parking stall.  Mary Dean was in the car.  Officers approached her, asked her to step out of the car, and asked her about her association with Defendant.

Officer Dustin Nail arrived at the repair shop parking lot with his trained drug-detecting canine "Nash."  Nail's report indicates his assistance had been requested around "13:10" (1:10 p.m.) and he arrived at "13:42" (1:42 p.m.).  Sgt. Thode asked Nail to have Nash do a free-air sniff around the Chrysler.  Nail positioned the dog near the rear of the Chrysler on the passenger side while Nail first walked around the vehicle, pausing at the driver's door to look in the window.  Nail then returned and walked around the back of the Chrysler.  He testified he was looking to make sure there were no hazards to a dog sniff.

Video from Nail's AXON body cam shows that as Nail walked along the driver's side prior to the dog sniff, the driver's door was ajar.  Body cam footage from approximately thirty minutes earlier, however, shows that the driver's door was completely closed.  (*Compare* Def. Exh. 33 at

18:14:36 *with* Def. Exh. 34 at 18:46:00.)  Nail testified he did not open the door and did not know who did.  Although the evidence did not show who opened the driver's door or why, the most reasonable inference is that one of the officers likely did so.  Defendant was in custody during this time and there is no evidence that Mary Dean reentered the driver's side of the Chrysler after the point at which video shows the driver's door was completely closed.

After completing his walk around the car, Nail walked over to Nash and gave him a find command, directing the dog's attention up and down along the passenger side of the vehicle while moving toward and around the front of the car.  Nash appeared to lightly touch the passenger side of the car as he sniffed around it.  When Nash reached the driver's side near the driver's door, he stopped, laid down, and almost immediately sniffed and focused underneath the car.  Nail testified – and the evidence showed – that the dog indicated at that point that he detected the odor of a controlled substance.  Nash briefly got up and sniffed toward the back of the car, but quickly laid down again and continued sniffing under the car, this time working his way on all fours back toward the midline of the car, just under the rear part of the driver's door.  Nash partially crawled under the car and was clearly focused on a point under the car.  He made contact with the underside of the car as he crawled under it.  Officers reached under the car to photograph and remove what turned out to be a box attached by magnets to the underside of the car.  Officers opened the box and found what appeared to be controlled substances.

### 4.  **August 3, 2021 Search of 2442 S. Holyoke**.

In the afternoon of August 3, 2021, officers executed the warrant for 2442 S. Holyoke.  According to a return, they found a "firearm, illegal drugs, paraphernalia, [and] indicia of residency."  (Govt. Exh. 10.)

### 5.  **February 14, 2022, Search of 2438 S. Holyoke**.

On February 10, 2022, ATF Task Force Officer Vincent Reel prepared and submitted an application for a search warrant on 2438 S. Holyoke based on suspicion that Defendant was distributing controlled substances from that residence.  United States Magistrate Judge Teresa J. James issued a search warrant on February 10 authorizing agents to search the residence for specified items, including drugs, drug paraphernalia, money, drug ledgers, firearms and ammunition, indicia of residency, and documentation of income.  (Govt. Exh. 13.)  A return indicates that officers found many of those items when they searched the residence on February 14, 2022.  (*Id.*)

## II.  Motion to Suppress (Doc. 24.)

### 1.  April 8, 2021, Search of Cadillac.

Defendant contends officers violated his Fourth Amendment rights by unlawfully searching the Cadillac on April 8.  Defendant argues the officers unlawfully conducted "at least five trespass-based searches" of the Cadillac, including by allegedly opening or touching one of the car doors before the dog (Bane) arrived, and by having Bane touch the Cadillac exterior and sniff inside one of its windows during the initial dog sniff.  (Doc. 24 at 13.)

**A.  Fourth Amendment Standards**.  The Fourth Amendment protects individuals against unreasonable searches and seizures of their "persons, houses, papers, and effects…."  U.S. CONST. amend. IV.  Although warrantless searches are generally presumed unreasonable (*see United States v. Latorre*, 893 F.3d 744, 756 (10th Cir. 2018)), pursuant to the "automobile exception" the search of a car is considered reasonable if police have probable cause to believe evidence of a crime will be found inside.  *See Wyoming v. Houghton*, 526 U.S. 295, 300 (1999).  If probable cause exists, police may search every part of the vehicle and its contents that may conceal the object of the search, including all containers within the vehicle regardless of ownership.  *Id.*

Supreme Court decisions from the last half of the twentieth century tended to characterize a "search" under the Fourth Amendment as having occurred "when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984.)  Under this so-called "*Katz* test," the reasonableness of a search was "assessed by balancing the degree of intrusion into an individual's privacy with the need for the search to promote governmental interests." *Leatherwood v. Welker*, 757 F.3d 1115, 1120 (10th Cir. 2014) (citing *United States v. Knights*, 534 U.S. 112, 118-19 (2001)).  The Supreme Court applied this test in *Illinois v. Caballes*, 543 U.S. 405 (2005) to find that police did not violate an individual's Fourth Amendment rights by conducting a dog-sniff of a vehicle during a traffic stop.  The Court found that "the use of a well-trained narcotics detection dog – one that 'does not expose noncontraband items that otherwise would remain hidden from public view' ... -- during a lawful traffic stop, generally does not implicate legitimate privacy interests." *Id*. at 409. The Court said the dog sniff "was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," and "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement." *Id*.

More recently, the Supreme Court endorsed a trespass-based Fourth Amendment test for searches that exists as an alternative to the *Katz* test.  *See United States v. Jones*, 565 U.S. 404, 409 (2012) ("the *Katz* reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test.")  In *Jones*, the Supreme Court found that the attachment of a Global Positioning System (GPS) tracking device to the undercarriage of a car to monitor its movements was a search under the Fourth Amendment.   The Court said the government "physically occupied private property for the purpose of obtaining information," which would have been considered a "search" under the Fourth Amendment when it was adopted. *Id.* at 404-05.  The

Court noted that a car is an "effect" protected by the Fourth Amendment and that Fourth Amendment case law was traditionally tied to common law trespass. The Court found the agents in *Jones* "trespassorily inserted the information-gathering device" on the car and thus engaged in a Fourth Amendment search.[2] *Id.* at 410. The Court explained that a "[t]respass alone does not qualify, but there must be conjoined with that what was present here: an attempt to find something or to obtain information." *Id.* at 408 n. 5. Thus, a "trespass on … 'effects' … is not alone a search unless it is done to obtain information; and the obtaining of information is not alone a search unless it is achieved by such a trespass…." *Id.  See also Florida v. Jardines*, 569 U.S. 1 (2013) (officers' "unlicensed physical intrusion" with a drug-sniffing dog on the curtilage of a home was a Fourth Amendment search).

      **B.  Standing**. Because Fourth Amendment rights are personal, and may not be asserted vicariously, a person challenging the search of a vehicle who is not the registered owner must ordinarily show a reasonable expectation of privacy by establishing that he had a legitimate possessory interest or lawful control over the car. *See United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009). A defendant may do so by establishing that he gained possession from the owner or from someone with authority to grant possession. *Id.* (citation omitted.) Evidence presented at the hearing showed the Cadillac was registered to Defendant's brother. Defendant presented essentially uncontroverted testimony that his brother granted him permission to use the car.

---

[2] A concurrence pointed out that at common law, a suit for trespass to chattels "could be maintained if there was a violation of 'the dignitary interest in the inviolability of chattels,' but today there must be 'some kind of actual damage to the chattel before the action can be maintained.'" *Jones*, 565 U.S. at 419 n.2 (Alito, J., concurring). In *United States v. Acuna*, No. 21-10035-JWB, 2022 WL 30181419, *6 (D. Kan. Aug. 3, 2022), the undersigned expressed doubt that "the momentary light touch of the exterior of a vehicle … by a dog … on a public roadside, amounted to a trespass at common law." The court need not decide that issue here, however, because as discussed *infra* it concludes that the second requirement for a Fourth Amendment search under *Jones* was not present here: that is, any trespass was not conjoined with an attempt to obtain information. In other words, the government did not "obtain information from intruding on a constitutionally protected area" when the dog touched the car. *Cf. Jones*, 565 U.S. at 406 n.3.

Under the circumstances, the court finds Defendant has established his standing to object to the search of the Cadillac.[3] *See United States v. Brown*, 288 F. App'x 518, 522 (10th Cir. 2008) ("Ordinarily, '[w]here the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle.'") (quoting *United States v. Rubio-Rivera*, 917 F.2d 1271, 1274 (10th Cir. 1990)).

**C. Abandonment**.

The government asserts that Defendant abandoned any privacy interest he had in the car by leaving it on the street and fleeing. (*See* Doc. 28 at 6.) In view of the court's conclusion below that the search of the Cadillac was in fact reasonable, the court need not address the issue of abandonment.

**D. Alleged trespasses on the Cadillac**.

Defendant alleges that prior to Officer Gumm's arrival with Bane, an officer "opened (or at least touched) one of the [Cadillac's] doors." (Doc. 24 at 13.) This allegation is not supported by credible evidence. To the contrary, the credible testimony indicated that none of the officers on the scene touched or opened a car door before Gumm arrived and conducted the dog sniff.[4] Defendant argues a prior search is suggested by the absence of body cam footage in the twenty

---

[3] *Jones* did not decide whether the defendant in that case had standing to raise a trespass-based objection to the search. The Court observed that the vehicle was registered to the defendant's wife and said defendant "had at least the property rights of a bailee." *Jones*, 565 U.S. at 404 n.2. It further noted that a lower court found the registration did not affect the defendant's ability to make a Fourth Amendment objection, and that the government did not challenge that issue, such that the Court did "not consider the Fourth Amendment significance of [the defendant's] status." *Id.* Like the defendant in *Jones*, Defendant would appear to have at least the rights of a bailee given the evidence that he was granted permission to use it by the registered owner.

[4] Defendant also suggested at the evidentiary hearing that Van Daley touched the car or stuck his gun/flashlight through the rear window when he first approached the car. The court finds from the evidence, including Van Daley's body cam video, that he did not touch the car or reach into it through the gap in the window. Moreover, any inadvertent touching of the car was inconsequential. It did not convey any information to the government and therefore was not a Fourth Amendment search. *See discussion of Jones, infra.*

minutes before Gumm's arrival and because Gumm's report says officers advised him upon his arrival that the car "was unlocked and that there were keys inside."  (Govt. Exh. 5 at ANDERSON_000023.)  The fact that there is no body cam footage showing officers waiting for Gumm, does not, by itself, indicate that an unlawful search took place.  It is not surprising that officers would choose not to record conversations amongst themselves when they are not dealing with the public.  As for the statement by some unnamed officer that the car was unlocked and there were keys in it, it is more likely that this resulted from an officer's observations through the car windows than from a prior search.  Although the Cadillac's windows were heavily tinted, there was enough sunlight that officers could have seen some details in the car by peering through the windows, including that the locking plunger on the rear driver's side door appeared to be in an "up" unlocked position.  The suggestion that officers searched the car before Gumm arrived also appears inconsistent with the fact that the driver's door was locked when Gumm first tried to open it, and the car alarm was then triggered when he unlocked and opened the driver's door.  A prior search, had it occurred, likely would have included opening the driver's door where Defendant had been seated.  Additionally, the comment that there were "keys inside the car" suggests that an officer may have seen keys laying in the car but had not retrieved them or determined what they were associated with. In sum, the evidence indicates no prior search was made.  Finally, the court notes there is no evidence that any touching of the car by officers prior to the dog sniff produced or was causally related in any way to the probable cause that developed from the dog sniff.

Defendant next contends that "Bane touched the exterior of the Deville and sniffed inside one of the Deville's windows during the initial dog sniff," which was facilitated by Officer Gumm, and which constituted a trespass that violated Defendant's Fourth Amendment rights.  (Doc. 24 at 13.)  The court rejects this argument for two reasons.

The court first rejects the assertion that Bane sniffed "inside" the car window.  Defendant's argument to the contrary appears to be based solely on Gumm's report, which in fact states that the dog "sniffed inside the windows deeply."  (Def. Exh. 7.)  But the assertion is refuted by Gumm's body cam video, which shows that the dog's snout never reached into or was even particularly close to the gap in the slightly lowered rear door window. (Def. Exh. 6 at 20:27:25.)

The video does show that Bane momentarily touched the driver's door of the car with his paws at one point, but the court concludes this act did not constitute a Fourth Amendment search within the meaning of *Jones*.  Justice Alito indicated that at early common law, "a suit for trespass to chattels could be maintained if there was a violation of 'the dignitary interest in the inviolability of chattels….'" *Jones,* 565 U.S. at 419 n.2.  It is not clear that the "dignitary interest" in possession of a car on a public street is violated by the inconsequential touch of a dog, especially when the person with a right to possess the car was not even present.  Even assuming that type of touch could have been considered a trespass under early common law, however, the act lacked the second required element of a Fourth Amendment search: namely, the trespass must have been "done to obtain information."  *Id.* at 408 n.5.  A "trespass on … 'effects' … is not alone a search unless it is done to obtain information; and the obtaining of information is not alone a search unless it is achieved by such a trespass…."  *Id.*  Only where the obtaining of information "is achieved by … a trespass" can a constitutional violation be present.  *Id.*  The government (through the dog) was engaged at the time in a search for information, but that search was unquestionably permissible insofar as the car was not touched.  And the results of the search would have been no different had the dog not touched the car at all.  It momentarily touched the car with its paws, but the government "achieved" no information from that trespassory act.  "Trespass alone does not qualify, but there must be conjoined with that … an attempt to find something or obtain information."  *Id.*  The dog's

inconsequential touching of the car with its paws, which disclosed no information to the government, was not a Fourth Amendment search.  *Cf. Jardines,* 569 U.S.at 6, 11 (officers "gathered that information by physically entering and occupying the area"; "[t]hat the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.")

To the extent one might argue that the dog's mere contact with the car helped facilitate the information gathering because it allowed the dog to get closer to the car or gain a more advantageous position from which to sniff odors emanating from the vehicle, that is not the point under the law.  The cases finding a trespass-based search under the *Jones* standard all involved circumstances in which information was gained directly through the trespass.  For example, in *Jones* the trespass occurred through placement of the GPS tracker on Jones' car.  *Jones,* 565 U.S. at 403.  Thus the trespass was indispensable to obtaining the information sought by law enforcement.  Similarly, in *United States v. Richmond*, the trespass that established the Fourth Amendment violation occurred when a law enforcement officer physically touched a tire for the purpose of determining whether there might be illegal drugs inside.  915 F.3d 352 (5th Cir. 2019). Just as in *Jones*, the trespass in *Richmond* was not incidental to the information-gathering process, it was an integral part of that process; indeed, it was indispensable to the information-gathering process in that case.  Unlike *Jones* and *Richmond*, in this case the government gained no information through the dog's contact with the car.  The contact was incidental, and no more objectionable than if an officer brushed up against the side of a vehicle during a traffic stop. Accordingly, Bane's contact with Defendant's automobile in this case did not amount to a Fourth Amendment search.

Defendant does not dispute that Bane alerted at the rear driver's side door of the car and that such an alert by a trained dog gives rise to probable cause to search the car. (Doc. 24 at 14-15.)   The court concludes that the dog's alert (or indication) gave the officers probable cause to search the interior of the vehicle for controlled substances.  *See Shaw v. Schulte*, 36 F.4th 1006, 1017 (10th Cir. 2022) ("A dog alerting during the sweep of a vehicle provides officers with probable cause to search the vehicle."); *United States v. Moore*, 795 F.3d 1224, 1232 (10th Cir. 2015) ("We have held that an alert, or a change in a dog's behavior in reaction to the odor of drugs, is sufficient to establish probable cause to search a vehicle, and that a final indication is not necessary.")  Given that fact, the court rejects Defendant's argument that the officers committed additional trespasses by entering the car after the dog alert.  (Doc. 24 at 13.)   The court thus concludes that the officers' search of the Cadillac was reasonable under the Fourth Amendment.

**2. First Search of Millwood Residence**.  Defendant contends the initial search warrant for the Millwood residence lacked particularity by not specifying any crime, by authorizing "photographs and measurements" without further description, and by allowing a general search for "indicia of ownership."  Defendant argues the warrant was fatally overbroad and that the valid portions of it are not severable from the invalid ones.[5]  (Doc. 24 at 16-23.)   Defendant further contends the good faith doctrine of *United States v. Leon*, 468 U.S. 897 (1984) does not preclude suppression because the warrant was so facially deficient as to preclude reliance upon it and because Gray himself drafted the warrant and cannot reasonably rely upon its inadequate description.  (Doc. 24 at 28.)

---

[5] Defendant also argues the first Millwood search and all subsequent searches were tainted by the officers' unlawful search of the Cadillac (See Doc. 24 at 16.)  Because the court has now rejected the argument that the search of the Cadillac was unlawful, it accordingly rejects the argument that the Cadillac search tainted any of the subsequent searches.

In response, the government asserts that the warrant does not need to specifically identify the crime and that the other items objected to by Defendant were as specific as they could be under the circumstances.  (Doc. 28 at 23-24.)  Even if one or more of the provisions was deficient, the government argues those portions can be severed from the valid ones.  Finally, the government argues that under the *Leon* good faith exception the court should reject suppression because a reasonable officer could have believed the warrant to be valid and relied on it in good faith

**A. Standards**.  "The Fourth Amendment provides that 'no Warrants shall issue' without 'particularly describing the place to be searched, and the persons or things to be seized.'"  *United States v. Suggs*, 998 F.3d 1125, 1132 (10th Cir. 2021) (quoting U.S. CONST. AMEND. IV). To ensure that searches are tailored to their justifications and do not become wide-ranging exploratory searches, the "particularity requirement" requires a search warrant to "describe the items to be seized with as much specificity as the government's knowledge and circumstances allow."  *Id.* (quoting *United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988)).  "'The test applied to the description of the items to be seized is a practical one…,' and the language in warrants is to be read in a "common sense fashion…."  *Davis v. Gracey*, 111 F.3d 1472, 1478 (10th Cir. 1997) (quoting *Leary*, 846 F.2d at 600 and *In re Search of Kitty's East*, 905 F.2d 1367, 1374 (10th Cir. 1990)).  "A warrant need not necessarily survive a hyper-technical sentence diagraming and comply with the best practices of *Strunk & White* to satisfy the particularity requirement."  *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009).  "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized."  *Wellington v. Daza*, 2022 WL 3041100, *4 (10th Cir. Aug. 2, 2022) (quoting *Leary*, 846 F.2d at 600).

An overbroad warrant may be "cured" by the particularity of an accompanying affidavit if two requirements are met.  First, "the affidavit and search warrant must be physically connected so that they constitute one document." *Leary*, 846 F.2d at 603 (citations omitted).  Second, the search warrant must expressly refer to the affidavit and incorporate it by reference using suitable words of reference.  *Id.*  The Tenth Circuit has stated in unpublished decisions that physical connection of the documents at the time of issuance may be sufficient for the first element:  "[I]n determining whether a warrant satisfies the particularity requirement, courts may consider incorporated documents that were physically attached to the warrant when it was issued but not when it was executed if the officer who applied for the warrant was one of the officers who conducted the search and the defendant does not contend that the executing officers exceeded the scope of the items listed in the attachment." *United States v. Nolan*, 854 F. App'x 977, 981 (10th Cir. 2021) (*citing United States v. Perez*, 145 F.3d 1347, 1998 WL 188320, *4 & n.2 (10th Cir. 1998) (unpublished)).

The doctrine of severability can sometimes save a facially invalid warrant.  *Suggs*, 998 F.3d at 1137.  As explained in *Suggs*:

> We apply a multistep analysis to determine whether a warrant is severable. First, we divide the warrant in a commonsense way. Then we examine the validity of each section. If at least one section passes constitutional muster—meaning it satisfies the probable cause and particularity requirements of the Fourth Amendment—we determine whether the valid parts are distinguishable from the invalid ones. When "each of the categories of items to be seized describes distinct subject matter in language not linked to language of other categories, and each valid category retains its significance when isolated from [the] rest of the warrant, then the valid portions may be severed from the warrant."

*Suggs*, 998 F.3d at 1138 (citations to *United States v. Sells*, 463 F.3d 1148 (10th Cir. 2006) omitted).  Blanket suppression may still be required if "the invalid portions so predominate the warrant that the warrant in essence authorizes a general, exploratory rummaging in a person's belongings." *Id.* (citation omitted.)  Courts may admit seized items in this context only when the

valid and distinguishable portions "make up the greater part of the warrant," as judged from the warrant itself and examining "both the quantitative and qualitative aspects of the valid parts of the warrant relative to the invalid parts." *Id.* (citation omitted.)

Even when evidence is obtained as the result of a deficient warrant, the good faith exception of *Leon* may still prevent suppression of the evidence. The exclusionary rule does not apply "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Leon*, 468 U.S. at 920. In that circumstance, excluding evidence will not further the ends of the exclusionary rule. After all, "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *Id.* "In the ordinary case, an officer cannot be expected to question the magistrate's probable-case determination or his judgment that the form of the warrant is technically sufficient." *Id.* A warrant issued by a judge thus normally suffices to establish that a law enforcement officer acted in good faith in conducting the search. But the officer's reliance on the magistrate determination must be "objectively reasonable," and will fail to satisfy that standard in the following circumstances: (1) when the magistrate was misled by an affidavit that the affiant knew was false or would have known was false but for his reckless disregard of the truth; (2) when the magistrate "wholly abandoned his judicial role"; (3) when the warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) when the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers cannot presume it to be valid. *Id.* at 923.

**B. Analysis**.

**Particularity**.   Defendant first contends the warrant lacked particularity because it "directed officers to take '[p]hotographs and measurements'" but "did not say what particular items (or even what general categories of items) officers could search for, photograph, and measure."  (Doc. 24 at 16; Doc. 24-1 at 5.)  As an initial matter, the court notes it is unclear the extent to which the police taking photographs or measurements in the course of executing a search warrant constitutes a separate search or seizure within the meaning of the Fourth Amendment.  *Cf. Belton v. Wydra*, No. 3:17-CV-02006 (KAD), 2021 WL 1056770, at *13 (D. Conn. Mar. 18, 2021) (finding officer was entitled to summary judgment on a § 1983 claim for taking photographs during a search of residence); *Wilson v. Layne*, 526 U.S. 603 (1999) (officers violated the Fourth Amendment by inviting reporters to videotape a residential search because the intrusion was not in aid of execution of the warrant, although the officers were entitled to qualified immunity because the law was not clearly established).  *Layne* indicated that some police actions relating to the objectives of a search are implicitly authorized by a search warrant – such as detaining a homeowner while executing the warrant – and observed that "it might be reasonable for police officers to themselves videotape home entries as part of a 'quality control' effort to ensure that the rights of homeowners are being respected, or even to preserve evidence…."  *Layne*, 526 U.S. at 613.  This seems entirely reasonable.  Officers who are authorized by a warrant to be present in a residence and to search for specified items are obviously free to document by written means whatever they lawfully see and find in the course of the search, and they are subsequently free to testify as to any and all such details.  There seems little added infringement upon homeowner privacy interests from allowing officers to photograph or measure areas or items they are otherwise authorized by the warrant to examine.   At the same time, permitting photographs and measurements furthers legitimate interests in protecting homeowners, police, and the integrity of

evidence.[6]  The authority to take photographs and measurements related to the objectives of the warrant thus may be implicitly authorized by the warrant itself.

At any rate, the court rejects the argument that the authorization in this warrant to take "photographs and measurements" violated the particularity requirement of the Fourth Amendment. Reading the search warrant in a practical rather than technical sense, the inclusion of photographs and measurements among the items officers were authorized to search for is reasonably construed to mean the officers were authorized to photograph and measure to the extent their search revealed any information relating to the listed items.[7] This authorization allowed searchers to reasonably ascertain and identify the things authorized to be searched and seized.  It would have been impractical to predict and itemize beforehand what particular photographs and measurements might have evidentiary value – for example, a picture or measurement showing the athletic shoes described in the warrant in proximity to a particular bedroom occupied by Defendant.  No greater particularity in the authorization to photograph or measure was necessary or practical under the circumstances.

---

[6] *Cf. United States v. Jacobsen*, 466 U.S. 109, 119 (1984) ("Respondents do not dispute that the Government could utilize the Federal Express employees' testimony concerning the contents of the package. If that is the case, it hardly infringed respondents' privacy for the agents to reexamine the contents of the open package by brushing aside a crumpled newspaper and picking up the tube. The advantage the Government gained thereby was merely avoiding the risk of a flaw in the employees' recollection, rather than in further infringing respondents' privacy. Protecting the risk of misdescription hardly enhances any legitimate privacy interest, and is not protected by the Fourth Amendment."); *Lopez v. United States*, 373 U.S. 427, 439 (1963) ("Indeed this case involves no 'eavesdropping' whatever in any proper sense of that term. The Government did not use an electronic device to listen in on conversations it could not otherwise have heard. Instead, the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose. * * * Stripped to its essentials, petitioner's argument amounts to saying that he has a constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment. For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory.")

[7] The court reaches its conclusion based solely on the language of the Millwood search warrants and need not determine whether the officer's applications were effectively incorporated into those warrants.  *Cf. Suggs*, 998 F.3d at 1137 ("[W]ithout clear incorporation of an affidavit into a search warrant, we cannot simply assume the former shapes the latter.")

The court reaches a similar conclusion with respect to the warrant's authorization to search for "[i]ndicia of occupancy or ownership." Defendant argues this item lacked particularity because it "allowed officers to search for and seize indicia of ownership of anything and everything." (Doc. 24 at 23.) The language of the warrant could have been more detailed but it nevertheless was sufficiently particular to refute the prospect of a general search. While it may be common in search warrants to include examples of documents that indicate occupancy (e.g., utility bills), failing to do so does not render the terms impermissibly vague or over broad. Moreover, the terms "occupancy or ownership" were tied together here, indicating they referred to items capable of being alternately occupied or owned by a person. And the warrant described only two items capable of "occupancy": the Millwood residence itself and the Cadillac DeVille. (Doc. 24-1 at 5.) A reasonable officer examining the warrant would understand that the authorization to search for indicia of "occupancy or ownership" was limited to the items described in the warrant and, more particularly, to the only two items listed that could be occupied. The language of the warrant thus allowed searchers to reasonably ascertain and identify the items to be searched and seized.

Defendant makes a number of additional arguments against severance of the allegedly defective portions of the warrant, including "at least six reasons" that officers "were actually concerned with finding some very different items (e.g., drugs, paraphernalia, and guns) because they were actually interested in investigating some very different offenses (e.g., drug-trafficking and gun crimes)." (Doc. 24 at 18.) Because the court rejects the argument that the warrant was defective, it need not consider the arguments pertaining to severability. For present purposes it is sufficient to note that the officers' hope of obtaining proof of Defendant's involvement in drug distribution does not invalidate the search warrant for items related to the felony offense of fleeing and eluding, nor does it render the initial search and seizure of items from the Millwood residence

unreasonable. The Supreme Court clarified in *Horton v. California* that objective standards of conduct, rather than an inquiry into the subjective state of mind of an officer, governs reasonableness in this context, and moreover that an officer's discovery of evidence in plain view during execution of a search warrant need not be "inadvertent" or unexpected to constitute an objectively reasonable search and seizure:

> The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement. If the officer has knowledge approaching certainty that the item will be found, we see no reason why he or she would deliberately omit a particular description of the item to be seized from the application for a search warrant. Specification of the additional item could only permit the officer to expand the scope of the search. On the other hand, if he or she has a valid warrant to search for one item and merely a suspicion concerning the second, whether or not it amounts to probable cause, we fail to see why that suspicion should immunize the second item from seizure if it is found during a lawful search for the first.

*Horton*, 496 U.S. 128, 138-39 (1990).

The evidence here shows the initial search of the Millwood residence was reasonable. There is no evidence that officers exceeded the scope of the warrant that authorized the search. The warrant was supported by probable cause to believe that Defendant committed the felony offense of fleeing and eluding and probable cause to believe that items relevant to that offense – including clothing and indicia of residency tending to show that Defendant was in fact the person who had committed the offense – would be found in the Millwood residence.[8] While executing the warrant officers saw other evidence they were entitled to seize under the plan view doctrine, including marijuana. After discovering such items in plain view, officers suspended the search and sought a judicial warrant to expand the search to include various items related to drug

---

[8] Defendant argues the officers were not really interested in such evidence, that they did not really need it in view of other evidence they already possessed, and that they could have obtained the specified items through other means. None of these arguments undermines the reasonableness of the search or the compliance of the warrant with the Fourth Amendment.

trafficking and firearms.  The court concludes that the initial and subsequent Millwood search warrants were valid and that the search and seizure of evidence from the residence was reasonable under the Fourth Amendment.

**Good faith**.  Even had the court found that one or both of the challenged Millwood warrant provisions lacked the particularity required by the Fourth Amendment, the court would still find that officers relied on the warrant in objective good faith.  "Even if a court ultimately determines that a warrant approved by a judge falls short of the constitutional requirements of probable cause or particularity, evidence will not be suppressed if 'a law enforcement officer relies in objective good faith on a warrant issued by a detached and neutral magistrate.'" *United States v. Cotto*, 995 F.3d 786, 795 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 820 (2022) (citing *United States v. Knox*, 883 F.3d 1262, 1273 (10th Cir. 2018) (citing *Leon*, 468 U.S. 897, 922 (1984)).

Defendant contends the "glaring lack of particularity in both the First Warrant and the Second warrant rendered both warrants 'so facially deficient … that the executing officers c[ould not] reasonably presume' they were valid."  (Doc. 24 at 28.)  The court disagrees.  The courts generally presume that officers executed a search warrant in objective good faith.  *Cotto*, 995 F.3d at 795.  Nothing about the circumstances of the Millwood searches undermines that presumption.  "[I]t is indicative of good faith when the officer who prepares an affidavit is the same one who executes a search."  *Id.* at 796 (citation omitted.)  Officer Gray drafted the affidavits in support of the Millwood warrants and helped to execute them.  Further, "an officer's efforts to obtain approval of a warrant application from a superior and an attorney also indicate the officer was acting in good faith."  *Id.* (citations omitted.)  Gray followed that procedure here, including having the applications reviewed by an attorney with the district attorney's office.  Most important is the language of the warrant itself, which in this instance authorized a search for three specific items

of clothing, a specific set of car keys, and "photographs and measurements" and "indicia of occupancy and ownership."  Even assuming the latter two items were defective without some additional limitation, any defect was minor at most, subject to reasonable debate, and could have been remedied with a minor change.  A reasonable officer considering these items in the context of the other items listed in the warrant could have plausibly concluded they were sufficiently particular to permit the officer to ascertain and identify the items authorized to be searched for and seized. *Cf. United States v. Potts*, 586 F.3d 823, 834-35 (10th Cir. 2009) (good faith applied where reasonable officer could have construed some items in the warrant as being limited by other parts.) The officers had a substantial good faith basis for relying on the validity of the warrant, and as *Leon* indicated, a police officer in these circumstances can hardly be expected to second-guess the legal conclusion of a judge trained in the law on such matters.  *Leon*, 468 U.S. at 921 ("an officer cannot be expected to question the magistrate's … judgment that the form of the warrant is technically sufficient.")

### 3.  Second Search of Millwood Residence

Defendant contends the second Millwood search warrant was invalid for two reasons: (1) because it relied on fruits of the first search; and (2) because it contained the same "photographs and measurements" authorization.  (Doc. 24 at 24.)  The court rejects these arguments for the reasons indicated in the previous section, including that suppression is not appropriate given the officers' objectively reasonable good-faith  reliance upon the warrant.

### 4.  Search of the Chrysler

Defendant contends officers "conducted at least three trespass-based searches of the Chrysler," including when the dog (Nash) touched the Chrysler's exterior while sniffing it, when officers removed a magnetic box from the underside of the car and opened it, and when officers

opened the front passenger-side door and opened the glove compartment.  (Doc. 24 at 25.[9])  The court finds no violation of Defendant's Fourth Amendment rights up to the point of Nash's alert on the underside of the car, and no violation thereafter given the existence of probable cause to believe the car contained a controlled substance.

To the extent Nash touched the passenger side of the Chrysler when he began the sniff, the court concludes this was not a Fourth Amendment search, as the alleged trespass produced no information to the government.  As the court discussed previously, only where the obtaining of information "is achieved by … a trespass" can a constitutional violation be present. *See supra* (citing *Jones,* 565 U.S. at 419 n.2).  The dog's incidental touch of the car was therefore not a Fourth Amendment search within the meaning of *Jones*.  Defendant also challenges Nash's touching the underside of the Chrysler on the driver's side when he went after the magnetic box underneath the car.  In fact, the evidence shows that Nash alerted by laying down near the driver's door and sniffing under the car well before he crawled under the car and made contact with the underside of it. Nail's body cam video shows that Nail commented when the dog laid down and sniffed under the car that the alert "was pretty immediate." (*See* Def. Exh. 34 at 18:45:42.)  The uncontroverted evidence was that Nash is well-trained in detection of certain controlled substances.  From the point at which Nash first alerted, officers had probable cause to believe the car contained controlled substances.  *See Florida v. Harris*, 568 U.S. 237, 248 (2013) (if the government has shown unrefuted evidence that the dog reliably detects drugs, the court should find probable cause).  Any

---

[9] Defendant's brief also asserts that "[t]o conduct the dog sniff without a warrant, officers needed probable cause to believe that the Chrysler contained contraband or evidence of a crime," and argues "the dog sniff … constitutes an unlawful search" because officers did not have probable cause.  (Doc. 24 at 25.)  But while reasonable suspicion may be required to detain a person or their vehicle, no level of suspicion is required to conduct a dog sniff on the exterior of a vehicle, as it does not constitute a search under the Fourth Amendment.  *See United States v. Hawley*, 660 F. App'x 702, 708 (10th Cir. 2016) ("neither probable cause nor reasonable suspicion is necessary because a dog sniff is not a search under the Fourth Amendment.")  Defendant, who was under arrest and in custody at the time of the dog sniff, has not argued that officers somehow violated his Fourth Amendment rights through a detention of Mary Dean or the Chrysler registered to her.

touching of or entry into the car after that point, by the officers or the dog, was a reasonable search under the Fourth Amendment, as the existence of probable cause made a search for controlled substances in the vehicle and any containers in it (or attached to it) reasonable under the automobile exception to the warrant requirement. *Cf. United States v. Chavez*, 2021 WL 4438742, *5 (10th Cir. Sept. 28, 2021) (quoting *United States v. Parker*, 72 F.3d 1444, 1450 (10th Cir. 1995)) ("Once probable cause to search is established, the officer may search the entire vehicle, including the trunk and all containers therein that might contain contraband.")

As noted previously, although the driver's door of the Chrysler was slightly ajar at the time of the dog sniff, video evidence showed the door had been completely closed about a half an hour earlier, indicating someone had opened it in the interim. The evidence did not explain how this occurred, but the most reasonable inference is that one of the officers opened the door at some point. Assuming this to be so, and further assuming that it involved some sort of search by the officer, the evidence shows that the probable cause from the dog's alert was obtained independently of any search of the car interior and was in no way tainted by it. The dog immediately and emphatically alerted on the underside of the vehicle where the magnetic box was located, and the fact that the driver's door was slightly ajar at that point clearly had no impact or effect on the dog's alert. Moreover, Nail's report indicates his assistance was first requested at 1:10 p.m., when the evidence suggests the driver's door was still completely closed, such that the request for his assistance was in no way related to any entry into the Chrysler. (Def. Exh. 44.) In sum, notwithstanding the door issue, the drugs found in the magnetic box under the car were the product of a reasonable search under the Fourth Amendment and are not subject to suppression. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (suppression turns on whether evidence "has been come at by exploitation of [an] illegality or instead by means sufficiently distinguishable

to be purged of the primary taint."); *United States v. Rendon*, 462 F. App'x 923, 927 (11th Cir. 2012) (dog sniff was not tainted by officer's prior entry into trailer where there was no connection between the entry and the dog alert).

**5. Searches of 2442 and 2438 S. Holyoke**.

Defendant contends these two searches were tainted because the applications underlying the search warrants included unlawfully obtained evidence from the prior searches challenged above.  (Doc. 24 at 26-27.)  The court rejects this argument because it finds that the evidence from the prior searches discussed above was lawfully obtained.

**III.  Conclusion**

Defendant's motion to suppress evidence (Doc. 24) is DENIED.  IT IS SO ORDERED this 21st day of February, 2023.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE